EMMA POPOVICS, petitioner-appellant,

v.

JOHN POPOVICS, defendant-respondent.

[Argued March term, 1925.    Decided May 18th, 1925.]

1. Where a decree of the court of chancery in a maintenance suit by a wife adjudged that the husband had abandoned and separated himself from her without any justifiable cause, and that he neglected and refused to provide for her, on an application for divorce by the wife the defendant stands convicted of desertion by the decree.

2. Evidence examined, and *held* that the efforts of the husband to induce his wife to return to him were not sincere, and did not come up to the requirements of the law, and the wife is therefore entitled to a decree of divorce.

On appeal from court of chancery.

*Messrs. Silverman & Grosman,* for the petitioner-appellant.

*Mr. Ernest P. Bird,* for the defendant-respondent.

The opinion of the court was delivered by

MINTURN, J.

On the 24th day of March, 1922, the defendant, husband, upon a petition for maintenance, filed by his wife, the petitioner, was adjudged by a decree of the court of chancery to have "abandoned and separated himself from her without any justifiable cause," and that he "refused and neglected to provide for her." With that adjudication, fixing the status of the parties, the wife, on December 24th, 1923, filed her petition in this cause for divorce from the defendant upon the ground of his desertion. Upon the hearing, the learned vice-

chancellor dismissed the petition upon the ground that the petitioner had failed to respond favorably to the overtures made by her husband seeking her return. From that decree this appeal has been taken.

The testimony taken in the suit for maintenance is before us as a part of the state of the case, and the contention is made that it forms no part of the record, since the only offer of the petitioner in the trial court was that of the record, and since the testimony taken does not properly constitute a part of the record, hence, the testimony is not properly before us upon this appeal. If that contention be conceded, we are still confronted with the undeniable fact that the defendant stands convicted of desertion by the decree of the court of chancery.

The desertion took place, according to the petition, which is a part of the record, in the month of September, 1921, since which time and for more than the statutory period of two years thereafter, the defendant has continuously and obstinately deserted the appellant.

The petition in the maintenance suit alleged facts which, in view of the finality of that decree, must be accepted as proved in the case. It depicts facts from which we are enabled to fully appreciate the state of mind of the wife, after the decree in her favor, when she testified that she failed to return to her husband because she feared him. The learned vice-chancellor, in the maintenance suit, found that her fear of the husband was fully justified, and that her departure from the household was entirely warranted by his cruel and vicious conduct. From the time of their marriage the defendant treated her harshly and cruelly, and if there was a period during the nineteen years of their marital existence when he manifested any other disposition towards her, the facts narrated fail to indicate it. He accused her of neglecting her home and of accosting and meeting other men upon the street for immoral purposes, and during those accusations frequently struck and beat her; at one time during a fit of temperamental anger, striking her upon the face. In the presence of her children he called her a common

prostitute, and indulged in other vile and filthy language, finally biting her right hand and ordering her from their home. This cruelty and abuse she bore in silence because, as she says, she was a stranger in a strange land, and for the sake of the children. But when her power of humility and self-abnegation weakened under the incessant strain, fear for her safety induced her to take him at his word, and she, with her two girls fled from the home, and thereafter she sought and obtained employment in a factory, from the receipts of which employment she maintained herself and the children. This financial support was supplemented, eventually, by the weekly contribution which the husband was forced to make by the decree of the vice-chancellor in the maintenance suit. Two years have elapsed since she left him, and during that period the status thus legally created was maintained until the filing of the petition in this cause, for a divorce, upon the ground of the husband's desertion. It is met by the latter with a plea that he has endeavored to procure her return, and that she has obstinately and unreasonably refused to listen to his appeal. A plea of that character must be supported by at least proof of his *bona fide* intention, and some proof of his heart-felt contrition for his past conduct. *Lister* v. *Lister, 65 N. J. Eq. 109; affirmed, 66 N. J. Eq. 484; McVicker* v. *McVicker, 46 N. J. Eq. 490.*

In estimating the sincerity of such an appeal, the court necessarily proceeds upon the theory *quo animo,* and in reaching any satisfactory conclusion as to his motives, the old adage that conduct speaks louder than words must needs play an important part. *Acta exteriora indicant interiora secreta.*

In the present instance, notwithstanding his conviction by the court of chancery, he still viewed his wife as a malfactor, and himself as an injured innocent. In that spirit he testified that when he called upon her, at her place of employment, with two witnesses, at the suggestion of his counsel, as it were, fully equipped to supply the necessary links in the proposed evidential chain against her, he said, "I will forgive everything and forget the past." He resided in Newark, and he knew her residence in the same city. He

called and interviewed the landlady. He wrote letters urging her to return, all of which he circumspectly copied, manifestly for evidential use, not one of which the petitioner says she received, and some of which were returned to him. He was indebted to her at Christmas time for overdue alimony, but he sent her a registered money order for $15 as a Christmas gift, which also was returned to him. His son, who continued to reside with him, he sent to induce the petitioner to return. Upon the witness-stand, where his contrition might be publicly evinced, and the *bona fide* character of his overtures fully examplified, he displayed his old *animus,* for there he again characterized her as an adulteress and again charged her with illicit relations with promiscuous men. He told of his pursuit of her with a detective upon the public streets in an endeavor to criminally entrap her; and, finally, he crowned his recital with a story of his efforts to publicly impale her before the Glen Ridge police court upon a charge of immorality. And during all of this period, while she was supporting herself and two children from her daily toil, supplemented by the allowance which the court compelled him to contribute, while her children were severed in their relationship, and the home that every woman craves, as the basis of conjugal felicity, was thus despoiled, he failed to conceive or utter the one word *"peccavi,"* that might have gone far to heal the miseries of their embittered years. He knew from nineteen years of a tempestuous life why she left his home. He knew why she shunned, abhorred and feared him. He knew with a vividness that no one else possessed that fear of him alone, instilled into her soul, by the intolerable cruelty of their bitter years, had conjured in her mind, as her testimony in this suit evidences upon every page, a Gorgon monstrosity, whose very vision carried with it the incarnation of embruted cruelty. He not only knew that such was her fear, but he knew that the court of chancery, by its decree of maintenance, had practically placed him in such a category. Love, and even decent respect, which tolerates and suffers hardships, misfortunes and human ills which arise in the companionship of married life, does not spring from such

a mental and moral attitude; nor, fortunately, is the American home constructed upon a foundation of fear, for the maxim is as ancient as the philosophy of Aristotle, that no man (and *a fortiori* no woman) can love the man whom he fears.

Therefore, to expect this petitioner, in such a situation, upon a perfunctory and artificial plea, enveloped in all the paraphernalia of a studied legal performance, to return to the embraces of the man who slandered, traduced, villified, beat and abused her, without even an expression on his part of apology, recantation or repentance for the past, and without any hope, promise or expectation for the future of a new and reformed life, under decent, social, conjugal conditions, would be to impose upon human nature an artificial and extravagant attribute of self-abnegation and slavish devotion, which neither the law of nature nor the law of the land contemplates or exacts.

The decree appealed from will therefore be reversed.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, BLACK, CAMPBELL, LLOYD, WHITE, GARDNER, VAN BUSKIRK, CLARK, McGLENNON, KAYS, JJ.   13.