FRIEDA STUTZ, petitioner-appellant,

*v.*

JOSEPH F. STUTZ, defendant-respondent.

[Argued October 22d, 1946.   Decided February 3d, 1947.]

*Messrs. Ford & Taylor (Mr. L. Stanley Ford,* of counsel), for the appellant.

*Mr. John J. Deeney,* for the respondent.

The opinion of the court was delivered by

PERSKIE, J.

This is a divorce case. *R. S. 2:50-2(c)*. Appellant, Frieda Stutz, sued respondent, Joseph F. Stutz, her husband, for a divorce on the ground of extreme cruelty. The alleged acts of cruelty are that her husband "called her vile names on many occasion," and that he "grabbed" (her) by the throat, severely choked her and forcibly ejected her from their residence, told her to get out and if she ever came back "he would finish where he left off * * * she * * * understood that to mean that (he) would kill her if she returned;" and that as a result of these "acts of extreme cruelty her health became impaired," "her life was rendered one of such wretchedness and misery as to incapacitate her from carrying on her duties as (respondent's) wife;" and that under her husband's control, her "health" would become more "severely impaired" in the "future."

Generally stated, "extreme cruelty" as used in our Divorce Act is "such cruel conduct as endangers the safety of the person, or the health of the aggrieved party, either actually inflicted or reasonably apprehended." *Smith* v. *Smith, 40 N. J. Eq. 566, 594; Taylor* v. *Taylor, 73 N. J. Eq. 745; 70 Atl. Rep. 323; Cavileer* v. *Cavileer, 94 N. J. Eq. 160, 163; 119 Atl. Rep. 101; Cf. Julian* v. *Julian, 127 N. J. Eq. 77, 83; 11 Atl. Rep. (2d) 99; Oliver* v. *Oliver, 127 N. J. Eq. 367, 369; 13 Atl. Rep. (2d) 310; McCabe* v. *McCabe, 129 N. J. Eq. 431, 433; 19 Atl. Rep. (2d) 687; MacArthur* v. *MacArthur, 135 N. J. Eq. 215, 219; 37 Atl. Rep. (2d) 76.* Actual physical violence need no longer be proved. *Doty* v. *Doty, 92 N. J. Eq. 660; 114 Atl. Rep. 546.* In that case a combination of circumstances such as the drunkenness of the husband resulting in his unemployment, calling his wife vile names, charging her with infidelity, all of which rendered the wife such discomfort and wretchedness that it incapacitated her from discharging her duties as a wife, were held to constitute extreme cruelty. See *MacArthur* v. *MacArthur, supra* (at *pp. 219-220*.)

Thus the court in each case must look into the effect of the alleged misconduct. How did it affect the health, mental and phyiscal condition of the aggrieved spouse? Was the effect "substantially deleterious?" If allowed to continue would it reasonably have become so? *Fallon* v. *Fallon, 111 N. J. Eq. 512, 516; 162 Atl. Rep. 406.* And it is an elementary principle, "that every element in the proofs necessary to sustain a decree of divorce must be corroborated." *Hague* v. *Hague, 85 N. J. Eq. 537, 541; 96 Atl. Rep. 579; Howes* v. *Howes, 125 N. J. Eq. 272, 276; 4 Atl. Rep. (2d) 282.*

With these principles in mind we turn to the wife's complaint that she was called vile names by her husband. It will serve no useful purpose to quote the language which, according to the wife, her husband used in damning her. However vile or profane the language which he allegedly did use may be characterized, he did not accuse his wife of infidelity. The testimony of the wife, that she was called vile names, utterly lacks coroboration.

We next turn to the occasion of June 28th, 1944, the single act of alleged cruelty, namely, choking of the wife, as to which corroboration was offered.

What is the legal effect of a single act of violence? A single act of personal violence is not extreme cruelty within the meaning heretofore given that phrase where, as here, the injury, if any, was slight and the act was committed under circumstances which do not furnish reasonable apprehension that the continuance of cohabitation would be attended with further injury. *Cf. Cook* v. *Cook, 11 N. J. Eq. 195; Laing* v. *Laing, 21 N. J. Eq. 248, 250; Close* v. *Close, 25 N. J. Eq. 526; English* v. *English, 27 N. J. Eq. 579; Saunders* v. *Saunders, 82 N. J. Eq. 491; 89 Atl. Rep. 518; Cavileer* v. *Cavileer, supra* (at *p. 165*).

Conceding that there was corroboration of the wife's pleaded version of the assault, not all of those present at the time saw the alleged attack which unquestionably was the result of the uncontrollable temper of the husband. That temper got the better of him when his wife, contrary to his protests, insisted upon accompanying his relatives—as theretofore

planned—to return his father to his home in Pittsfield, Massachusetts. The alleged choking occurred in the bedroom which is right off the living room in which were seated the father, sister and brother-in-law of the husband. The sister did not testify. The brother-in-law did. He testified, among other things, that he "couldn't see the choking," but did hear the outcry made by the wife when she came running out of the bedroom and said, "Did you see that? He tried to choke me." The husband's father corroborated the wife. None of those present aparently deemed the choking sufficiently violent to come to the aid of the wife, although the door leading into the bedroom was open. The wife, despite her version of what took place, showed no physical marks of the assault.

We are satisfied that the proofs fail to establish the deleterious consequences attributed by the wife to the alleged assault. And we are also satisfied that the proofs fail to establish a basis for reasonable apprehension that the continuance of her duties as a wife to her husband would be attended with further injury. The contrary appears to be true.

What has been the conduct of the parties toward each other, especially that of the husband towards his wife since the unfortunate event of June 28th, 1944? Such conduct gives character to the acts which are relied upon as grounds for divorce. *Cf. Cook* v. *Cook, supra; Kelly* v. *Kelly, 121 N. J. Eq. 255; 189 Atl. Rep. 381.* On the very night following the incident, the husband called at the home of his sister and brother-in-law, where the wife was staying overnight prior to the trip to Pittsfield. He pleaded that she return to his home but she refused to do so. True, she can perhaps be said to have exhibited some fear when, after her return from Pittsfield, she was accompanied by a policeman when she called for her clothes. But it is also true, and all this comes from the lips of the wife, that she sent her husband postal cards in which she greeted him as "Sweetie;" that she went out with him during Easter week and that he "was very nice" (to her); that she went out several times to cafes and to have dinner with him, and also went with him to a circus at the Madison Square Garden, in New York City;

and that on several occasions when passing their home she would, at his request, join him on the porch and they would talk to each other. On each of the aforestated occasions the husband asked his wife to come home. She refused. Additionally, the husband made written requests for her to come home. She still refused. Surely if the husband had, in fact, been disposed to injure his wife, he had ample opportunity during the many times he was with her alone to have done so. On the contrary, his conduct, during those occasions, was that of a repentant husband.

We are entirely satisfied that the wife did not fear for her safety, and that the single corroborated act of cruelty complained of was, in the stated circumstances, insufficient to entitle her to a divorce.

The decree below dismissing the wife's petition was proper and is affirmed.

*For affirmance*—The Chief-Justice, Parker, Bodine, Donges, Heher, Perskie, Colie, Wachenfeld, Eastwood, Wells, Rafferty, Dill, Freund, McGeehan, McLean, JJ. 15.

*For reversal*—None.